And later he declared positively that they could not be produced by the ice cream.

It would be tedious and unprofitable to follow these witnesses in detail, but enough has been pointed out to show that opposed to the testimony of one physician, who bases his conclusion upon his assumption that the plaintiff was poisoned by tyrotoxicon, is the testimony of three men fully qualified to speak, and they concur in the essential matters involved in the case, and they are entirely uncontradicted in the most essential points. Giving the plaintiff the benefit of the assumption that there was evidence entitling him to go to the jury at the close of his case, we are fully persuaded that the verdict is not supported by the weight of evidence, and that it ought not to stand. The evidence is far stronger that the plaintiff took the poison into his system at his evening meal than that he was wronged by the defendant in selling him a dish of ice cream, and the burden was upon the plaintiff to establish that he received the poison from the defendant, and not from any other source. This he has clearly failed to do. The only affirmative evidence is that furnished by the plaintiff that he ate the ice cream, and by his physician that certain symptoms developed. But the plaintiff also testified that he ate beefsteak at 5 o'clock in the afternoon, and the overwhelming weight of evidence is that meat is equally liable to produce the exact symptoms detailed by the plaintiff and his witnesses, and within the time which had elapsed between the taking of the food and the occurrence of the symptoms. Besides this, the evidence is undisputed that the symptoms from ptomaine poisoning might develop at any time within 36 hours of the taking in of food, and that the question of what kind of poisoning resulted could not be determined without an analysis, based upon actual examination of the excretions. In other words, we are asked to hold that a mere diagnosis of a comparatively unknown physician is to take the place of evidence, and that the defendant is to be charged with responsibility for the plaintiff's misfortunes without a particle of evidence to show that he was in any manner liable for the presence of poison in the plaintiff's stomach and bowels. We might, with the jury, guess that he took in the poison with the ice cream; but it would be merely a guess, unsupported by any tangible evidence, and contrary to the weight of evidence appearing in the record.

The judgment and order appealed from should be reversed, and a new trial granted, with costs to the appellant to abide the event.

(161 App. Div. 73)

KEANE v. SEA BEACH RY. CO.

(Supreme Court, Appellate Division, Second Department. March 6, 1914.)

1. MASTER AND SERVANT (§ 278*)—ACTION FOR INJURIES—SUFFICIENCY OF EVIDENCE.

Evidence, in a motorman's action for injuries from collision with a train of work cars, *held* not to sustain a finding of negligence, in that the brakes on plaintiff's car were defective.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. § 278.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. MASTER AND SERVANT (§ 182*)—VICE PRINCIPAL.

The direction and control contemplated by Railroad Law (Consol. Laws, c. 49) § 64 (42a), providing that railroad employés intrusted with the authority of superintendence, control, or command of other employés, or with authority to direct or control any other employé in the performance of such employé's duty, are vice principals, must emanate from superior authority.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 371, 372; Dec. Dig. § 182.*]

Appeal from Trial Term, Kings County.

Action by Dennis Keane against the Sea Beach Railway Company. From a judgment for plaintiff and an order denying a new trial, defendant appeals. Reversed, and new trial granted.

Argued before JENKS, P. J., and BURR, THOMAS, RICH, and STAPLETON, JJ.

D. A. Marsh, of Brooklyn, for appellant.

Don R. Almy, of New York City, for respondent.

JENKS, P. J. This is a common-law action for negligence brought by servant against master. The servant was injured when a car of which he was the motorman came into collision with a train of the defendant's work cars. A moment before collision the car had been driven by Walden, a novice then under instruction by the plaintiff. But when collision seemed imminent, the plaintiff thrust Walden aside and took control. The learned court submitted "two specific claims" of negligence to the jury. The first was as to the alleged defective brakes of the car, and the second as to the negligence of the defendant in management of the train.

[1] As the verdict for the plaintiff was general, we cannot determine the ground of liability found by the jury. I think that the judgment cannot be affirmed because a casting of liability upon the "first specific claim" of negligence would be against the weight of the evidence.

The accident occurred about 3:45 p. m. of September 1, 1911. The plaintiff testifies that the brakes were defective so that both a longer time and a greater distance were required to stop the car. He does not specify any particular defect. He testifies that on the day of the accident he told the defendant's starter, Leckie, of this defect. But that testimony is without corroboration save that Walden testifies that he heard some conversation, which he could not recall save that the starter asked the plaintiff to make up lost time, and the plaintiff answered that he could not do so with that car, but Walden could not remember what reason was given by the plaintiff for his inability. For the defendant, Leckie, the starter, testifies that there was a conversation relating exclusively to the fact that the plaintiff was behind time, that plaintiff attributed the fault to the heavy travel, and that no mention was made of any defect. The plaintiff testifies on his direct examination that in this same conversation complaint had been made as to his delay. Thus plaintiff, his witness Walden, and Leckie, all agree that a subject of the conversation was the delay; but the plain-

tiff alone says that during that conversation he complained of the defective brakes, for Leckie denies this feature and Walden cannot recall it. The defendant's mileage computer, who made his report from the cards of the conductor, testified that run No. 2 had the car on the morning of September 1, 1911, also on the afternoon, and that no one else had it on that day. The defendant's dispatcher, testifying from his records, shows that the plaintiff had run No. 2 on September 1, 1911, from 6:38 to 7:40, and from 12:50 to 4:10 morning and afternoon. The said mileage computer testified that this motorman made nine trips in the morning and six trips in the afternoon and was "pulled in" by a wrecking crew. These two witnesses were not cross-examined, nor was their testimony attacked. Moreover, the plaintiff testifies that the brakes he had on the car in the morning worked properly, but whether it was this car or not he could not state, although he afterwards says that he changed cars on account of a defective spring in the trolley pole. It was also testified that examination after the accident revealed that the brakes were in good condition, except that incident to the collision the brake rod was broken. The plaintiff in describing the accident says that he was 75 feet away when the colliding train started to back; that he was running at the rate of 10 or 12 miles an hour; that he pushed the novice aside from working the car, seized the handles, and did all he could to stop his car, but before he could get into position to do anything his car had gone 40 feet at least, and when he hit the other train he was almost stopped. Thus, even with these brakes, he almost stopped this car traveling at the rate of 10 or 12 miles an hour in a distance of less than 40 feet.

[2] I shall not discuss the evidence as to the "second specific claim" of negligence, save one feature. It is clear that the train was backed down after its motorman or engineer received a signal from the defendant's employé Rooney. The plaintiff contends that Rooney was a vice principal within the purview of section (42a) 64 of the Railroad Law (Consol. Laws, c. 49) and the defendant insists that Rooney was a fellow servant. The contention arises upon the indefinite proof as to the status of Rooney and as to what capacity he was acting in at the time of his signal. Rooney was on the train, left it after it had been stopped, and went ahead to view the way. He testifies that he was a switchman and went to protect the switches, and again that he was the acting conductor, the flagman, the brakeman, and the switchman; but that there was another switchman, and two flagmen, on the train. As the engineer or motorman was backing his train, he could not see for himself whether he should continue his way. The question, then, is whether the engineer or motorman, when he acted upon the signal from Rooney, was obedient to a superior or merely relied, on account of his inability to see for himself, upon the aid of an inferior. For the direction and control expressed in the statute refers to emanation from superior authority. Hallock v. New York, O. & W. R. Co., 197 N. Y. 450, 90 N. E. 1124.

The judgment and order must be reversed, and a new trial must be granted; costs to abide the event. All concur.